May it please the Court, I'm Jimmy Robertson from Jackson, Mississippi, and I represent the Scruggs Appellants who are appealing three separate summary judgments that were granted in the United States District Court for the Northern District of Mississippi. I'd like to begin by emphasizing the reasons why the second opinion of this Court in Monsanto v. McFarling is not controlling here in any important particular. And those reasons are first, that opinion makes very clear that it is predicated upon the 435 patent. It corrected very clearly a mistake or a slip of the tongue, for lack of a better way of expressing it, from the first Monsanto opinion that said that the patents read on seeds and plants, not so in the 605 patent, which is all that's left in this case. The 435 patent, which did include seeds and plants, is not involved in this case. The second distinction between that case and this case is, first, the McFarling case was strongly influenced by the fact that the farmer had signed a technology agreement with Monsanto. Not so here. That's the reason the case was in Mississippi instead of in St. Louis. There is no Monsanto technology agreement here. Third, by far the most important, is in this case, the Scruggs Appellants presented to us proofs that the court said were lacking in the first Monsanto case. Not only was there substantial evidence on each of the important points that showed that there were more than just genuine issues of material fact, they were strongly supported by expert opinions from Professor Ian Ayers of Yale, an antitrust economist, Professor Peter Carstensen from Agricultural Markets, Professor Robert Tolleson at Clemson, who is a cartel specialist, Professor David Parvin, who is a Mississippi agricultural economist, and of course, having to do with the patent validity issues to begin with, Dr. William Folk from the University of Missouri, who is a plant molecular biologist, who presented a very important and credible two affidavits and expert reports that established that with respect to the patents that are in issue in this case, one taking the specification could not reproduce the inventions that are claimed in the patents, and therefore, at the very least, there is a question of fact with regard to the issues of patent validity. What did your experts say about written description? Was there any contention made about written description below that the three examples in the 605 patent were insufficient to describe the entire genus? Yes, and the one that was on the… I'm not now talking about the genus, whether it was sufficient to describe the promoter sequences from the cauliflower virus, but whether the combination of the promoter sequences with other genetic material was sufficiently described, because my understanding is that the 605 patents are only three examples given of that combination. Your Honor, it's my recollection that two of those examples had to do with the 19S patent instead of the 35S patent, and so the patent claims the 35S and the 19S. The 19S is not that it's actually related to this case. Yes, Dr. Folk went through the written description analysis and presented an opinion that I think is very much supported by the evidence, supported by the peer-reviewed literature. But opinion about what? The opinion… I'm not asking you about whether the promoter sequence of the cauliflower virus was sufficiently described. I'm asking you a different question, and I'm really asking whether this was raised at all, and that is the question of whether the combination of the promoter sequence with other genetic material, which is the subject of this patent, was adequately described. And my understanding is that there are only three examples of that given in the specification of the 605 patent. Your Honor, my best recollection of Dr. Folk's opinion is that he did consider the entire could not take the specification under the written description test and understand that the invention was in the possession of the inventors, and he made the same opinions with respect to the enablement requirement of Section 112 as well. So I would answer your question, yes, Your Honor, that Dr. Folk did make those representations and explain those in his opinions. His original opinion filed in February of 2002, a supplemental opinion… Where do I find that he addressed that particular point? I do not have that at my fingertips, Your Honor. Okay. With respect, though, to the 605 patent does not claim plants and seeds, and I think it's very important to understand that because of that, the patent grant that was important in the McFarland case and was important to the district court does not extend to a number of the claims and activities that Monsanto was involved in in this case. Specifically, the 605 patent has nothing in it that shows that Monsanto has any rights with respect to the Roundup or glyphosate herbicides. We've presented substantial evidence that there is either tying or bundling or leveraging or whatever you want to call it, and I suggest that that is an instance where Monsanto has exceeded the patent grant. The second one has to do—and this is the issue in McFarland, in a sense having to do with the tie between the transgenic trait that claimed in the 605 patent, the Roundup or ready trait, and the seed itself. Now, to emphasize that Monsanto has no rights in the seed itself—in fact, those seeds, the germplasm, was produced by the seed partners. I think it's important to understand that Monsanto set this up in their system from the beginning as two separate products, even though they are physically together. Monsanto made clear in a 1999 memorandum to the Justice Department having to do with the then-proposed acquisition of Delton Pine Land Company that it was only in the trait market. It was not in the seed market itself. And in fact, in support of that position, Monsanto's many planning documents set up the proposition that the seed and the trait are two separate products. The trait is always owned by Monsanto. It is licensed to the farmer for a technology fee. The seed itself is owned by the seed company, which is also a seed partner, a licensee of Monsanto, and it in turn sells the seed in its downstream channel to the farmer itself. So the point is that under the 605 patent, there's nothing in the claims of that patent that extends to the right to control the seed or the herbicide that's used with the particular product—in this instance, the trait, the Roundup Ready trait. But most important of all, there's nothing in the 605 patent or the other three patents that relate to the patent that authorizes Monsanto to establish what, for lack of a better term, is a seed cartel. And when I say that, I mean that Monsanto has license agreements, exemplars of which are in the record, that make it very clear that Monsanto has tied up the germplasm market. That is, all of the seed companies—I think the expression by one of Monsanto's deponents or Mr. Dave Rylander was, anybody who is anybody in the seed business has a license with us. What that has had the effect of doing, of course, is accomplishing the vision that's set forth in Monsanto's original planning documents, which was not just to be able to go into the market and compete with respect to this product that they claim to have invented, but rather to control the market to the exclusion of all other competing products. And in fact, they've succeeded because the record reflects that with respect to the three trait products that are involved in this case, the Roundup Ready soybean trait, the only other product that's out there as of the close of the record was STS Soybeans, which had only a 3% market share. The only competitor with the Roundup Ready cotton trait was BXN, which had about a 3% market share. And of course, the Bogart trait, the insect resistance trait in cotton, there's never been a competing product on the market insofar as the record reflects on that. So the point is simply that Monsanto has greatly exceeded the patent grant in setting— You mean by limiting it to the first user, the first farmer, and not allowing their seeds to be used in subsequent— That is one way in which they did it, and the reason that this is not controlled by what the court held in McFarling is there's nothing here that in this patent, any of these four patents, that in any way restricts the sale of seed. There's no license agreement as you had in McFarling. Only gene sequences are claimed in these patents, and that's why this is so different from McFarling. But the cartel idea that I just mentioned has been explained very carefully in the expert opinions by Dr. Robert Tolleson, by Dr. Ian Ayers, and Professor Peter Karstensen. I think there's a major issue that the district court—a number of issues the district court misunderstood. One of the important ones has to do with the attribution of the licensee's shares of seed sales to Monsanto for purposes of a market analysis, and the reason— Well, first place, whether there should be attribution is a question of fact. That is set forth in the— There's a Justice Department guideline that says the question turns on whether the license grantor, Monsanto, is using the license to substantially affect or control price. Dr. Ayers, in his opinion, sets forth that as the criteria for attribution, and in fact, what we have is a case where Monsanto, in its planning documents, particularly one called the Mays Team Protection Plan, a 1996 document, which we quoted in our briefs, makes it very clear that the purpose of the grower license approach that Monsanto implemented was to put Monsanto in a position where it could control the price of the seed to the downstream user, that is ultimately the farmer. And there's a quote also in that plan that we're doing this to avoid putting ourselves at the mercy of the pricing decisions of seed companies. It's also very important to understand that in 01 and 02, Monsanto is making important presentations to the investment community, and what they're doing is showing their strong market share, and they present themselves at both the Roundup Ready traits in soybeans and cotton, and, of course, the insect-resistant trait. Now, no, excuse me. This is just the 90% level. The only way that can be is to include the seed partner shares, which is exactly what Judge Pepper says that you should not do. In fact, the Third Circuit in remand, no, the Ninth Circuit in remand in the Kodak and Image Services case held that aggregation was proper, where the facts showed that the aggregation was proper, as it is here. Also, there's a Third Circuit case, the name of which escapes me, that's cited in our brief that recognizes this premise, but it is a question of fact, and the overwhelming evidence was that Monsanto did have a direct control over the pricing. We didn't follow that Ninth Circuit case in this circuit, did we? We had the Xerox case that did not follow that one. Now, on this particular issue, I don't believe this court has spoken to it, sir. And that was the same case, though, right? This was the remand from the U.S. Supreme Court's Eastman Kodak case. Again, this is an issue that has not, to my knowledge, been addressed in this court, in my research, have not found any case that addressed the question of aggregation. So I would suggest that the market share should be attributed from the seed partners directly to Monsanto. I would suggest that the important part of the case that the district court overlooked in its summary judgment consideration was the long series of planning documents from Monsanto where they made exactly clear what it was they were going to try to do. And it starts in 1994 with a BT Cotton value capture plan, the best one in terms of expressing the Monsanto view that has been effectively implemented that shows that they greatly exceeded the patent grant is the Project Atlas. I apologize. I think my time is up. Thank you very much. Thank you very much, Your Honors. Mr. Waxman. Thank you, Your Honor. May it please the Court. Judge Dyke, the two expert reports of Dr. Folk, which is the only patent validity non-infringement expert, are found, the original report is found on page 4510 of the joint appendix, and the supplemental report is on page 14,284 of the joint appendix. Neither one of those reports discusses in any respect, unless I've missed it in perusing it, the issue of written, I believe the issue of written description at all, per se, and certainly doesn't address the adequacy or inadequacy of the written description of the combination that is of the Chimera that is claimed in the 605. There is discussion So they didn't below raise the contention that written description wasn't satisfied because three examples in the 605 patent were sufficient to be representative of the whole genus? Right. They did raise it. I have to go back and look at the briefing below. They certainly raised it as to the promoter sequence, and I believe they raised it as an invalidity issue. That is because there was assertedly a fragmentation that occurred during the transformation in soybeans as opposed to cotton. There was all this confusion about whether the 605 patent actually claims the Roundup Ready seed or whether there's an entire 35S promotion sequence. And the record, there is some confusion, I think, that pervades even the reply brief. The record in this regard is absolutely clear. The district judge was entirely correct. Dr. Oshutsky's expert report, which can be found beginning at page 6,195 of the joint appendix, compares the published sequences by Frank, which was But that all has to do with whether the promoter sequence was sufficiently described to satisfy a written description, not as to whether the combination. That's correct. And the combination issue wasn't raised below. I don't believe that it was raised below, and I don't believe that it was raised. The court can draw its own conclusions about whether it's raised by the blue brief and the gray brief in this case, but I believe that this issue of the promoter sequence and whether the promoter that is in the Roundup Ready gene is in fact claimed is entirely clear from the record that it is. There is an intact 35S promoter from the cauliflower mosaic virus that initiates transcription of this transgenic gene. I don't believe that there is anything in the expert reports to substantiate in any way a non-enablement claim on the combination between the cauliflower. The written description claim. The written description claim or the enablement claim, for that matter. I wanted to raise one other issue that comes up in the reply brief that I think is not entirely, our response is not entirely clear for the record, and then address Mr. Robertson's contentions. There is repeated reference to the fact that, you know, in Argentina and Great Britain and Brazil, Monsanto does it another way and collects a royalty from seed savers. I want the record to be entirely clear that Monsanto does not sell transgenic genes at all in Great Britain or Brazil or Argentina. It tried to in Argentina, but since Argentina doesn't extend patent protection to the Roundup Ready seeds as the GAO report that's included in the joint appendix concludes, the rampant black market eliminated Monsanto's ability even to collect a licensing fee. So there is no, the notion that Monsanto has done it another way in other places, which is filled in their expert reports, is simply incorrect. Could I move you for a moment to one of the antitrust issues and the allegation that there's a tying between the trait and the use of Roundup, and the district courts seem to reject that on the ground that Monsanto could enforce the EPA requirements. I would have thought that under fashion originators and the Indiana dentist case, that that is not a permissible use of a tying arrangement. What's your comment on that? That's not really addressed. My comment on the tie between the herbicide and the seed is that that tie, that the restriction that only Roundup be used over the top of Roundup Ready was in place in the years 1996 to 1998 when A, Monsanto had a patent on glyphosate and the glyphosate formulation, and B, FIFRA under the EPA under FIFRA permitted only Roundup to be used over the top. Yeah, but what's the answer as to whether that EPA requirement can appropriately be enforced by a private party? I thought it was pretty clear that it wasn't, that it was not an appropriate use of a tie, for example, to enforce an EPA requirement. Well, first of all, there's no issue of enforcement here because it was a license requirement and the one thing that Mr. Scruggs has maintained from the outset is he doesn't have a license, he didn't sign a license agreement. He may not have any trust standing, but in terms of patent misuse, that seems to be the ground that the district court rejected this patent misuse defense based on this tying arrangement and the question, and he did so, the district court, as I read it, the opinion did so on the ground that no other herbicide would satisfy EPA requirements and it was appropriate for them to enforce that EPA requirement as part of the agreements that they had with the seed producers and the farmers. Judge, I'm not entirely certain about the state of the record, but my understanding is that Monsanto, in obtaining EPA approval both for the Bollgard seed and for the Roundup Ready seed, had to comply with certain EPA restrictions imposed under FFRA in addition to the patenting issues, and one of the conditions was that only properly labeled herbicides or that users, growers, be instructed in the label that only FFRA approved labeled herbicides be used over the top, but in any event, that restriction disappeared after 1998. Yeah, but there would be a question as to if it was misused, whether it dissipated, and also it would bear on the ability to recover damages during that 1996 to 1998 period. Well, no, with respect, at the most, I mean, those provisions are not, quote, still in force. They were license restrictions that applied to the licensed use of seed purchased in those years. At most, Mr. Scruggs bought 10 bags of these seeds without signing any a patent misuse defense. If I understand a patent misuse, the fact that you might not have antitrust standing or that you weren't injured individually is not a reason that the patent misuse defense is inapplicable. If you misuse the patent with respect to other people, the Scruggs can still assert a patent misuse defense here, right? I believe that that is, in fact, a correct statement of the law. My only submission here is I believe that Monsanto was required by EPA to instruct, in the use instructions, to instruct people only to use EPA approved herbicides over the top. In any event, as I said, the notion of, since 1998, for the past eight years, there has been no such I do remember the case. I don't recall that there's any, I may be wrong, but I don't recall that there's a patent misuse issue or a tie issue here that goes to whether compliance with a regulatory requirement by a federal agency over a regulated entity, that is, Monsanto, selling FIFRA approved seed, transgenic seed, could constitute an antitrust. Where do I find it in the record? How do I know that this is an EPA imposed requirement that the seed labeling include that restriction? I am not even sure. I will undertake to look through the record and advise the court. I'm not even sure that it's in the record in this case. I do know that EPA imposed a number of requirements on Monsanto, particularly in the cotton area where it's required to instruct farmers to establish refuges and the sort, and I don't know whether it's in the record. I actually can't really bring the whole 32,000 page joint appendix to mind. I think our principle submission, I don't believe that the argument that enforcement of an EPA requirement or instructions or a license condition that only EPA approved herbicides be used over this new technology would constitute patent misuse, but I certainly could stand corrected by your honor of this court. I don't think that argument was ever made below or made in this court before. The argument has been from the other side, well those, that restriction may have existed in the 96 to 98 licenses, but those licenses continue to be enforced today, which of course they don't unless somebody has never planted seed bought in those years. But Monsanto's seeking damages against drugs for the 1996 to 1998 period, is it not? I believe it's, for the soybeans I believe it's 1997 through 2000, and for the cotton 1999 and 2000. Well at least there's some overlap with the period during which these restraints were in effect. That's correct. Now he says he didn't sign a license, he's never claimed to be bound by any of the license provisions, and I don't, I mean I take your point about there either is or isn't patent misuse. Our submission I think is that it's not, would not have been patent misuse to instruct users as a condition of a license that they only use an herbicide which A, itself was patented and covered by a monopoly, and there is an interesting legal question about the rules regarding a tie between two patented products. And as I said there was certainly a, as the district court construed the license agreement which he didn't sign in any event and claims not to have read, it required in effect that if you were going to use glyphosate over the top, that you use Roundup which was A, patented, and B, the only one that was approved by EPA under FIFRA. I did want to make one comment about, at least about the seed cartel arguments. I mean just stopping for a second on McFarland, the 605, the fact that the 605 patent claims genes and cells containing those transgenic chimeric genes and there is not a claim for the seed or the plant, I think is absolutely legally irrelevant. Every single cell in Roundup ready seed and a Roundup ready plant contains the transgenic gene that is covered by the 605 patent. And in fact in McFarland too, the only patent, the only patent infringement claim that was adjudicated, that had been adjudicated in that case was the 605 patent. It's quite true that this court issued an out note to a claim by Mr. McFarland that the 435 patent was invalid and the court rejected that because that claim hadn't been made before. But it was actually the 605 patent that had been adjudicated to have been infringed and the notion that that was a contract breach action and not a direct infringement action can't be in any way relevant because it was an alleged tie between the trait and the germplasm that was alleged to be the patent misuse in that case. And this court said quite properly that in the context of products like seeds which produce copies of themselves, quote, licensing restraints on the use of goods produced by the licensed product are not beyond the scope of the patent grant. And that is equally true whether the claim, whether the patent covers every cell in the plant or the plant or the seed itself. Now as to the cartel allegations in this case, there is absolutely no evidence in this case, whatever one thinks about the relevant markets or market power or anything like that, there is absolutely no evidence in this case of any agreement between Monsanto and the 300 different seed companies that are licensed to produce both conventional varieties and Roundup Ready varieties or any bad act that Monsanto took that caused seed companies to raise prices. Monsanto sets a price for its technology fee and it does not restrain in any way what seed companies charge for seed and the record shows that among varieties there is very great variation. Thank you. Thank you, sir. The case is submitted.